IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AIMEE MORAN and JESSICA MAZZEO, | : | |
|     *Plaintiffs*, | : | |
| | : | CIVIL ACTION |
| v. | : | NO. 21-3327 |
| | : | |
| ROCKWELL DEVELOPMENT GROUP, LLC, *et al.*, | : | |
|     *Defendants*. | : | |

<u>MEMORANDUM</u>

Jones, II  J.                                                                                               March 21, 2022

## I.      Introduction

Aimee Moran and Jessica Mazzeo (hereinafter "Plaintiffs") are both single mothers who purchased homes in one of the Rockwell Development Group (hereinafter "Defendants")' neighborhoods.  Since signing their purchase agreements, Plaintiffs allege that there have been marked delays in completing construction of their homes, Defendants' workmanship has fallen below industry standard, and Defendants have misrepresented material information to Plaintiffs and treated them less favorably because of their sex and marital status.  As a result, Plaintiffs brought suit, alleging the following causes of action: (1) violations of the Fair Housing Act (hereinafter "FHA"); (2) violations of Pennsylvania's Unfair Trade Practices and Consumer Protection Law; (3) breach of contract; (4) fraudulent misrepresentation and/or concealment; and (5) negligent misrepresentation and/or concealment.

Presently before the Court is Defendants' Motion to Dismiss (hereinafter "Motion").   For the following reasons, Defendants' Motion is granted in part and denied in part.

1

## II.     Statement of Facts

### A.  Plaintiffs Purchase Homes from Defendants

Plaintiffs are both single mothers who purchased homes in Defendants' neighborhood, The Carriages at Runnymeade Farms.  Am. Compl., ECF No. 17, ¶¶ 1-2.  Plaintiff Moran entered into her purchase agreement with Defendant on December 21, 2018 for 504 Trotter's Court (hereinafter "Lot 14"), and Plaintiff Mazzeo entered into hers on January 30, 2019 for 102 Trotter's Court (hereinafter "Lot 10").  Am. Compl. ¶¶ 16-17; *see* Moran and Mazzeo's Purchase Agreements, attached to Am. Compl. as Exhibits A and B.  Their purchase agreements incorporated numerous design specifications for their lots.  Am. Compl. ¶ 18.  Specifically, Plaintiff Moran requested a "Loft with Open Rails" at an added cost of $32,500, and Plaintiff Mazzeo chose the "Alternative Layout" on the first floor for an additional $5,775.  Am. Compl. ¶ 18.

The purchase agreements also contained the option of upgrading to include an exterior deck; however, neither Plaintiff chose to exercise this option.  Am. Compl. ¶ 19.  Plaintiff Moran's purchase agreement noted that the estimated settlement date would be "Summer 2019," and Plaintiff Mazzeo's stated that closing would occur in the "Summer/Fall 2019."  Am. Compl. ¶ 20.

### B.  Defendants Begin Building Plaintiffs' Homes

Throughout the winter and spring of 2019, Defendants began construction on Lots 14 and 10.  Am. Compl. ¶ 22.  However, Plaintiffs allege that throughout the entire building process, Defendants missed deadlines, cut corners, and cavalierly dismissed all of Plaintiffs' concerns.  Am. Compl. ¶ 22.

Am. Specifically, even though Defendants promised to provide, at the minimum, bi-weekly construction updates, Plaintiffs only received information on the status after they begged for more information. Am. Compl. ¶ 23. Though Plaintiffs would occasionally drive by their houses to check on the status of construction, they would often find their construction remain untouched for weeks. Am. Compl. ¶ 24. With these long delays, Plaintiffs grew concerned about the ultimate settlement dates on their houses, and Defendants' construction crews even cautioned that Plaintiffs would be lucky if their settlements would occur as late as January of 2020. Am. Compl. ¶ 25. Because of these delays, Plaintiff Moran could not move into her home until November 27, 2019, and Plaintiff Mazzeo was unable to move in until December 19, 2019. Am. Compl. ¶¶ 27-28.

### C. Defendants Discriminate Against and Harass Plaintiffs

Plaintiffs allege that Defendants routinely dismissed concerns with their homes because they are women. Am. Compl. ¶ 32. They explain that other neighbors in the community who had a man in the house were able to get comparable problems more favorably addressed. Am. Compl. ¶ 33.

#### 1. Issues With Home Construction

Plaintiffs faced many defects with the design, construction, and representation of their homes. Am. Compl. ¶ 36. For example, even though Plaintiff Mazzeo paid and had blueprints for a home with an alternative first-floor layout, which would allow for three (3) extra feet of open space in her kitchen, Defendants framed her house in accordance with a standard first-floor base layout. Am. Compl. ¶ 37. When Plaintiff Mazzeo raised concerns over the improper layout, Defendants refused to correct the error until she involved another vendor. Am. Compl. ¶ 38. However, instead of fixing the mistake, Defendants attempted to conceal it by framing a stud

wall to separate the kitchen area from the dining room, which mimicked the appearance of the alternative layout, but did not provide the extra square footage in her kitchen that she paid for. Am. Compl. ¶ 38. Even though Plaintiff and Defendants' vendor put Defendants on notice of this issue, Defendants continued to frame the walls and install the HVAC system and ductwork throughout the entire house. Am. Compl. ¶ 39. By the time Defendants addressed the issue, reframing the walls and relocating the HVAC system caused inevitable further delays. Am. Compl. ¶ 39.

Even after she moved in, Plaintiff Mazzeo further complained that certain appliances and fixtures installed by Defendants were not properly functioning, but Defendants allegedly never took her complaints seriously and blamed the issues on operator error. Am. Compl. ¶ 40. Specifically, when Plaintiff Mazzeo complained her dishwasher was not properly draining, Defendants told her she was not using it correctly. Am. Compl. ¶ 41. However, further inquiry revealed that Defendants had mis-installed the dishwasher drainage tubing. Am. Compl. ¶ 41. Similar scenarios arose from Defendants improperly installing Plaintiff Mazzeo's toilet and kitchen sink. Am. Compl. ¶¶ 42-43. Plaintiff Mazzeo's complaints were echoed by Plaintiff Moran who alleges that Defendants deviated from her desired blueprints when constructing her home. Am. Compl. ¶ 44.

### 2. Defendants' Employees Sexually Harass Plaintiffs

Defendants employ Project Managers and Assistant Project Managers who act as liaisons between them and customers. Am. Compl. ¶ 30. Plaintiffs allege that multiple Project Managers and Assistant Project Managers harassed and behaved inappropriately toward them. Am. Compl. ¶ 45. One such Project Manager (hereinafter "HP") made several uninvited advances toward Plaintiff Moran, including asking her on a date. Am. Compl. ¶ 46. HP also told Plaintiff Moran

that he was single, even though he was a married man with a pregnant wife. Am. Compl. ¶ 47. Like Plaintiff Moran's experiences, HP would also comment on Plaintiff Mazzeo's appearance, and on two (2) occasions, he touched her on the shoulders or lower back without consent. Am. Compl. ¶ 48.

Similarly, an Assistant Project Manager (hereinafter "KC") generally treated Plaintiffs inappropriately. Am. Compl. ¶ 49. In June of 2020, when Plaintiff Mazzeo sent KC a text thanking him for dropping some building materials off and asking what she owed him, KC responded "A shot or 2!!!," insinuating he wanted to have a drink with her. Am. Compl. ¶ 51. This was not the only time KC implied a desire to have a drink with either Plaintiffs, and, at one point during the summer of 2020, KC invited himself into their homes and gifted each a bottle of whiskey. Am. Compl. ¶ 52. KC has also placed his arm around Plaintiff Moran several times and asked her out on dates no fewer than a dozen times. Am. Compl. ¶¶ 53-54. When Plaintiff Moran rejected his advances, KC responded that he would never stop pursuing her. Am. Compl. ¶ 54.

Beyond these more individualized harassments, Plaintiffs allege that Defendants also treated them differently and less favorably as single mothers. Am. Compl. ¶ 56. For example, more than a year after Plaintiffs made several complaints about the quality of their homes, a Service Project Manager stated in a letter that they had beautiful homes, despite how "hard [it is] to keep up with family and dog[s]." Am. Compl. ¶ 56.

### D. Housing Issues Continue Post-Settlement

When Plaintiff Moran moved into her home as the first occupant of the neighborhood, the issues with her home ranged from unsightly to unsafe. Am. Compl. ¶ 58. Specifically, her home

had the following defects: improperly poured concrete garage flooring;[1] a broken window in the master bedroom; wrong and improperly laid tile in her master bath shower and floor;[2] no trim on her kitchen island cabinets; an improperly installed and dripping kitchen faucet; hidden holes in the subflooring; unfinished siding;[3] broken doors to the laundry room; and a urine and feces-stained toilet that had been used by the construction workers and left for her to clean. Am. Compl. ¶ 59.

Plaintiff Mazzeo similarly experienced multiple issues with her new home. Am. Compl. ¶ 64. In fact, on the day of her settlement, Plaintiff Mazzeo discovered a leaking sewage pipe in her basement and that the front door did not lock. Am. Compl. ¶ 65. Upon actually moving into the home, Plaintiff Mazzeo also discovered the following issues: pooling water in her basement by the hot water heater; a broken range hood; a leaking kitchen sink; no closet or pantry shelving in the entire home; no barn door over her study (a design upgrade she had paid extra for); leaking sinks in the master bathroom; no toilet paper or towel holders in any bathroom; no shower curtain rod in the hall bathroom and no shower doors in the master bath (leaving no opportunity to bathe); and the seeping smell of sewage in the master bathroom. Am. Compl. ¶ 66. Despite the seriousness of these issues, Plainiff Mazzeo had to beg Defendants to resolve them, and it took over eight (8) months to get them addressed. Am. Compl. ¶ 67.

Other issues remain unresolved by Defendants. Am. Compl. ¶ 68. For example, with even a minimal amount of rain, a significant amount of water pools in the front doors of both

---

[1] After eighteen (18) months of waiting, in June of 2021, Defendants re-poured Plaintiff Moran's garage flooring. Am. Compl. ¶ 63.
[2] In early 2020, Plaintiff Moran exchanged many messages with Defendants regarding the chipping and improperly laid tile in the bathroom; this issue was not resolved until July of 2020. Am. Compl. ¶ 60.
[3] Plaintiff brought this issue to Defendants' attention numerous times, and each time she was allegedly ignored. Am. Compl. ¶ 62. Over one year with missing siding, in February of 2021, a large amount of rainwater poured into Plaintiff Moran's bedroom, soaking the bed and carpet. Am. Compl. ¶ 62. Only after this did Defendants repair the missing siding and roof. Am. Compl. ¶ 62.

Plaintiffs' homes, and Plaintiff Moran's home also has issues with water pressure and temperature in her second-floor bathrooms. Am. Compl. ¶¶ 69-70. Despite Plaintiffs raising these concerns to Defendants, Plaintiffs allege that Defendants ignored them and, rather, blamed Plaintiffs for them. Am. Compl. ¶¶ 70-72. Most recently, Plaintiffs have both learned that all the trim woodwork in their houses is not wood but is a cheaper, lower quality board. Am. Compl. ¶ 74.

In addition to these more individualized issues, there are several problems that are universal to both Plaintiffs' homes. Am. Compl. ¶ 75. First, both homes have issues with temperature regulation. Am. Compl. ¶ 76. Defendants sent its HVAC and insulation contractors out to Plaintiff Moran's home to investigate the issue, but the contractors blamed each other for the issue. Am. Compl. ¶ 78. In March of 2021, Defendants sent a third-party HVAC company out to do a full assessment of Plaintiffs' homes, and they determined that the HVAC units were improperly balanced and needed correcting. Am. Compl. ¶ 79. Though Plaintiff Mazzeo's unit was successfully rebalanced, Plaintiff Moran's remains unfixed as of the date of this writing. Am. Compl. ¶ 79. There are still ongoing investigations as to the insulation quality of Plaintiffs' homes. Am. Compl. ¶ 80.

Plaintiffs have also had issues surrounding the floors Defendants installed in their homes. Am. Compl. ¶ 82. Though Defendants allegedly advertised that the floors in their homes would be "hardwood," after moving in, Plaintiffs realized they had "engineered" hardwood floors, which have a thin veneer of hardwood and are of less quality and durability. Am. Compl. ¶¶ 81-83. Defendants also did not properly install the floors, and the planks are separating from each other. Am. Compl. ¶ 84.

Plaintiffs further allege that Defendants misrepresented how decks were not included with the base price of a home, even though this went against township requirements. Am. Compl. ¶ 96. During late 2018 into early 2019, Defendants were in a dispute with the Township of Edgmont over whether Defendants were required to install decks on every home because the decks were depicted in the development plans that were submitted to and approved by the township. Am. Compl. ¶ 90. Ultimately, Defendants conceded and agreed that every home was to have a deck installed, and they agreed to adjust the base price on every home that had not already been under contract. Am. Compl. ¶ 91. Despite this, Defendants' sales and construction teams allegedly still informed homebuyers who were already under contract, Plaintiffs included, that a deck would be an upgrade at an additional cost. Am. Compl. ¶¶ 89, 92.

During Plaintiff Mazzeo's pre-construction meeting on or about March 29, 2019, Defendants' Project Manager DM (hereinafter "DM") provided her with a copy of her home renderings, which represented that a deck was not included with the base price of a home. Am. Compl. ¶ 93. If Plaintiff Mazzeo chose to not to pay for the deck, she was informed that she would have to install a metal bar over the sliding glass doors to allegedly comply with township code, even though her doors were essentially at ground level. Am. Compl. ¶¶ 94-95. To avoid having this unsightly metal bar, both Plaintiffs paid the extra cost to have decks added to their houses. Am. Compl. ¶¶ 97-98.

However, during an HOA Board Meeting in March of 2020, Defendants revealed to Plaintiff Mazzeo the township requirement that all homes in Defendants' community had to be built with decks. Am. Compl. ¶ 99. Plaintiff Mazzeo approached the Rockwell VP of Land Development CF (hereinafter "CF") about the misrepresentations over the decks and requested a refund for both her and Plaintiff Moran. Am. Compl. ¶ 100. However, CF responded that

Defendants decided that everyone was to pay for their decks "one way or another." Am. Compl. ¶ 100. Despite this statement, Plaintiffs allege that the owner of the home next to Plaintiff Mazzeo, an adult woman without children, did not want a deck, nor did she pay for one. Am. Compl. ¶ 103. Even so, her home included a deck. Am. Compl. ¶ 103. Similarly, a married couple who was also inquiring about the price of a deck for their home also received their deck for free because the male homeowner was "such a good customer." Am. Compl. ¶ 104.

Plaintiffs state that many of these issues are not limited to just their properties. Am. Compl. ¶ 108. In fact, the Carriages at Runnymeade Farms Community Association became so concerned with the homes' exteriors that it engaged Bustamante Engineers, Inc. to investigate the roofing across all the homes in the community. Am. Compl. ¶ 108. Their report revealed concerns with the: (1) workmanship of the asphalt shingle roofing, (2) vinyl siding installation, and (3) metal roofing's snow guards. Am. Compl. ¶ 109; *see* Report, attached to Am. Compl. as Exhibit D (hereinafter "Ex. D"). The report relies on Bustamante Engineers' inspection of the structures, and, with respect to the specific structure containing lots 101-105 Trotters Court, the report notes that the structure's "leak barrier" was improperly installed[,]" so "water that comes in contact with the leak barrier will be directed towards the fascia." Am. Compl. ¶ 111; Ex. D. Despite their recent construction, the report also noted that there is a "[d]amaged region" on the roof of Lot 10, and that "[l]int is likely obstructing the dryer line from exhausting at full capacity." Am. Compl. ¶ 112. There were also many structural issues with 501-504 Trotters Court, including issues with: (1) caulk around an electrical box; (2) structural concerns with vinyl siding; (3) sections of the roofing lacking exhaust ventilation; and (4) leak barriers being improperly installed. Am. Compl. ¶ 113.

### III.     Procedural History

Plaintiffs filed suit in the Eastern District of Pennsylvania on July 27, 2021.  *See* Compl., ECF No. 1.  After stipulating to file an Amended Complaint on October 8, 2021 (ECF Nos. 15 & 16), Plaintiffs filed an Amended Complaint on October 11, 2021 (ECF No. 17).  Plaintiffs' Amended Complaint asserts the following claims: (1) violations of the Fair Housing Act (42 U.S.C. § 3604); (2) violations of Pennsylvania's Fair Trade Practices and Consumer Protection Law (73 P.S. § 201-1); (3) breach of contract; (4) fraudulent misrepresentation and/or concealment; and (5) negligent misrepresentation and/or concealment.

On October 29, 2021,[4] Defendants filed the present Motion.  ECF No. 18.  Therein, Defendants move for dismissal of Plaintiffs' entire Amended Complaint based on the following reasons: (1) Plaintiffs' discrimination claims are not based on a protected class of persons and are too speculative to amount to discrimination; (2) Plaintiffs waived all rights to any special damages; and (3) their claims for fraudulent and negligent misrepresentations are barred by the gist-of-the-action doctrine.  Mot. 1-2.  Because, if the Court grants Defendants' Motion, only Plaintiffs' state law claims will remain, Defendants further argue that the Court should refuse to exercise supplemental jurisdiction and dismiss the Amended Complaint in its entirety.  Mot. 2.  Plaintiffs filed a Response in Opposition (hereinafter "Response") (ECF No. 19) on November 10, 2021, rebutting such arguments.  With these filings, Defendants' Motion is ripe for the Court's review.

---

[4] Plaintiffs correctly note that Defendants' response to the Amended Complaint was due fourteen (14) days after it was served on Defendants.  *See* Fed. R. Civ. P. 15(a)(3).  Fourteen (14) days after October 11, 2021 would have been October 25, 2021.  However, because Defendants filed the present Motion four (4) days later, this Court fails to see how Plaintiffs would be prejudiced by the slight delay and will consider the merits of the Motion accordingly.

### IV. Standard of Review

Rule 12(b)(6) provides for dismissal of a complaint, in whole or in part, for failure to state a claim upon which legal relief can be granted. In deciding a motion to dismiss, "'[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'" *Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 318 (3d Cir. 2008) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). While these claims do not require detailed facts, "a complaint must do more than allege the plaintiff's entitlement to relief. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009). A complaint must "show" the plaintiff is entitled to relief. *Id.* (quoting *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 234-235 (3d Cir. 2008)). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

Courts reviewing a motion to dismiss pursuant to Rule 12(b)(6) must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *See Phillips*, 515 F.3d at 233 (quoting *Pinker v. Roche Holdings, Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2008)); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 563 n.8 (2007). In the Third Circuit, the Court's review "is normally broken into three parts: (1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged." *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011).

Dismissal is appropriate when, even assuming all of plaintiff's claims as true, plaintiff has not pleaded "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.  If a plaintiff does not "nudge [his/her] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Id*.

## V.     Discussion

### A.  Plaintiffs' FHA Claim

The FHA forbids discrimination "against any person in the terms, conditions, or privileges of a sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(b).  It further provides that "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of...any right granted or protected by section 803, 804, 805, or 806 of this title." 42 U.S.C. § 3617.

Defendants argue that Plaintiffs' FHA claim should be dismissed because it misapplies the law to an unprotected class (single mothers) and is otherwise based on speculative assertions that fail to meet the pleading standard.  Mot. 5.  Plaintiffs respond that marital status is protected under the FHA through a sex-plus discrimination theory, and any alleged speculation ignores the specific instances of harassment and discrimination named in their Amended Complaint.  Resp. 7. The Court will address each in turn.

#### 1.  Marital Status as a Protected Class

A plain reading of U.S.C. § 3604 provides that it is unlawful to discriminate based on familial status. 42 U.S.C. § 3604(b).  Because Plaintiffs claim they were discriminated against because they are single mothers, they argue that gender plus their marital status constitutes discrimination under the FHA.  "Federal courts are split on whether marital status is protected by

the FHA." *Russick v. Wells Fargo, Inc.*, No. 17-CV-149, 2017 WL 2461456, at *6 n. 8 (W.D. Pa. June 7, 2017). However, courts that have found marital status to be protected have done so based on a sex plus discrimination theory. *See Lax v. 29 Woodmere Blvd. Owners, Inc.*, 912 F. Supp. 3d 228, 235 (E.D.N.Y. 2011) ("[T]his Court concludes that claims of 'sex plus' discrimination based on the combination of gender and marital status are cognizable under the FHA."); *Matthews v. New Century Mortg. Corp.*, 185 F. Supp. 2d 874, 886-886 (S. D. Ohio 2002) (holding that the plaintiffs are members of a protected class where their FHA claim was based on a combination of age, sex, and marital status).

Though not yet applied to the FHA, the Third Circuit has recognized a sex plus discrimination theory based on marital status in the context of Title VII. *See Rosencrans v. Quixote Enters., Inc.*, 755 F. App'x 139, 142 (3d Cir. 2018) (holding that a Title VII claim based on marital status raises a sex plus problem); *Bryant v. Int'l Sch. Servs., Inc.*, 675 F.2d 562, 573 n. 18 (3d Cir. 1982) ("In what has come to be known as a 'sex plus' problem, a claim of sex discrimination may be premised upon marital status."). As the Third Circuit makes clear, courts "frequently rely on...Title VII jurisprudence to guide [their] understanding of the FHA's antidiscrimination provisions." *Curto v. A Country Place Condo. Assoc., Inc.*, 921 F.3d 405, 411 n.4 (3d Cir. 2019) (citing *Cmty. Servs., Inc. v. Wind Gap Mun. Auth.*, 421 F.3d 170, 176 n.5 (3d Cir. 2005)). Because this Circuit recognizes marital status as a protected group under a sex plus discrimination theory, the Court is satisfied that such would still be applicable under the FHA.

As Plaintiffs' discrimination is based upon their marital status plus the fact that they are mothers (women), the Court holds that they are part of a protected class under the FHA. Whereas Defendants have failed to cite a single case where courts within this Circuit declined to

find marital status as a protected class, the Court will not consider such arguments further for purposes of this opinion.

### 2. Sufficient Facts Regarding Harassment and Discrimination

Defendants' remaining argument for dismissal of Plaintiffs' FHA claim states that, even if they are part of a protected class, Plaintiffs' allegations are too speculative to be considered discrimination. Mot. 8. Plaintiffs respond that such argument conflates the legal standard of summary judgment with that of a motion to dismiss, and Plaintiffs have sufficiently met the initial pleading standard. Resp. 7-9. Having reviewed the filings, the Court agrees with Plaintiffs.

"The FHA also prohibits coercion, intimidation, threats against or interference with any person in the exercise or enjoyment of rights granted or protected by the FHA." *Davis v. Rubin*, No. 20-CV-6271, 2020 WL 7624833, at *3 (E.D. Pa. Dec. 22, 2020) (citing 42 U.S.C. § 3617). "A Section 3617 interference claim requires proof of three elements: (1) that the plaintiff exercised or enjoyed any right granted or protected by [the FHA]; (2) that the defendant's conduct constituted interference; and (3) a causal connection existed between the exercise or enjoyment of the right and the defendant's conduct." *Revock v. Cowpet Bay W. Condo. Ass'n*, 853 F.3d 98, 112-13 (3d Cir. 2017) (internal quotations and footnote omitted). "Interference under Section 3617 may consist of harassment, provided that it is 'sufficiently severe or pervasive' as to create a hostile environment." *Id.* at 113 (quoting *Quigley v. Winter*, 598 F.3d 938, 947 (8th Cir. 2010)). "Harassment that intrudes upon the 'well-being, tranquility, and privacy of the home' is considered particularly invasive." *Id.* at 113 (quoting *Frisby v. Schultz*, 487 U.S. 474, 485 (1988)).

In *Davis*, this District granted dismissal of the plaintiff's § 3617 claim because she failed to "describe the harassment" or "link the alleged harassment to her exercise or enjoyment of a right under the FHA." 2020 WL 7624833, at *3. *See Iqbal*, 556 U.S. at 678 ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement of relief." (internal quotation marks omitted); *Twombly*, 550 U.S. at 570 ("Because the plaintiffs here have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed."). Unlike the plaintiff in *Davis*, Plaintiffs, here, dedicate an entire portion of their Amended Complaint to describing specific instances of harassment. *See* Am. Compl. ¶¶ 45-57. Specifically, Plaintiffs describe how some of Defendants' employees made uninvited advances towards them, including: asking them on dates, commenting on their appearances, touching their shoulders and lower back, texting them about having drinks, and inviting themselves into plaintiffs' homes with alcohol. Am. Compl. ¶¶ 45-57. Plaintiffs further explain that these advances were all made throughout their business relationship with Defendants, and Plaintiffs argue that they did not want to offend the harassing employees because they were worried it would result in further delays or problems with their homes. Am. Compl. ¶ 55.

Especially when this harassment could have interfered with the privacy and tranquility of Plaintiffs' homes, at this early, pleading stage, the Court is satisfied that such allegations could plausibly constitute harassment in violation of the FHA. Accordingly, Defendants' Motion as to Plaintiffs' FHA claim is denied.

### B. Supplemental Review of Plaintiffs' State Law Claims

Finding that Plaintiffs have adequately pled a violation of the FHA, the Court next turns to Defendants' request to dismiss Plaintiffs' relating state law claims. Defendants argue that

because Plaintiffs' FHA claim fails as a matter of law, this Court should decline to exercise supplemental jurisdiction over their remaining state law claims. Mot. 14. However, as previously stated, this Court finds that Plaintiffs have plausibly stated an FHA violation. Because Defendants have argued no other reason to dismiss Plaintiffs' state law claims, this Court retains supplemental jurisdiction over them. *See Samuelson v. Mid-Atl. Realty Co., Inc.*, 947 F. Supp. 756, 763 (D. Del. 1996) ("Both parties have agreed in their briefs that [the plaintiff]'s state law claim is part of the same case or controversy as his [fair housing] claim. Neither party asserted this case presents a novel issue of state law[,] and the Court sees no exceptional or compelling reason to decline jurisdiction over [the plaintiff]'s claim."). Thus, Defendants' Motion as to Plaintiffs' state law claims is denied.

### C. Plaintiffs' Waiver of Special Damages in their Purchase Agreements

Defendants further argue that, when Plaintiffs signed their purchase agreements, they waived the right to recover any special, punitive, consequential, or incidental damages or damages for delays. Mot. 11. However, as Defendants admit, "under Pennsylvania contract law, parties of *equal bargaining power* may contractually limit their liability for special, indirect, or consequential damages." *Philips-Van Heusen Corp. v. Mitsui O.S.K. Lines Ltd.*, No. 00-CV-665, 2002 WL 32348263, at *13 (M.D. Pa. Aug. 14, 2002) (emphasis added). Defendants further note that such a determination is proper at the summary judgment stage of a proceeding. Mot. 11; *see W. Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank*, No. 12-CV-76, 2013 WL 3993863, at *4 (W.D. Pa. Aug. 5, 2013) ("[I]t is premature at this early juncture to dismiss Plaintiffs' claim for consequential damages without discovery having occurred.").

Similarly, here, the Court has not had the benefit of discovery to determine whether such waiver is appropriate. This is especially true given that it is unlikely for Plaintiffs, two (2) single

mothers, and Defendants, a corporate development group, to be considered parties with equal bargaining power. Accordingly, though Defendants may raise such an argument at summary judgment, it is premature for the Court to rule on the waiver of such rights today, and Defendants' Motion as to such arguments is denied.

### D. Gist-of-the-Action Doctrine and Plaintiffs' Fraudulent and Negligent Misrepresentation Claims

Defendants finally argue that Plaintiffs' claims for fraudulent misrepresentation (Count IV) and negligent misrepresentation (Count V) are essentially recasting of their breach of contract claims (Count III) and are barred by the gist-of-the-action doctrine. Mot. 12. In response, Plaintiffs suggest that the gist-of-the-action doctrine is inapplicable here because Defendants breached a greater social duty owed to all individuals. Resp. 14. Having reviewed the filings, the Court agrees with Defendants.

Gist-of-the-action doctrine "preclude[s] a plaintiff from re-casting ordinary breach of contract claims into tort claims." *Hart v. Arnold*, 884 A.2d 316, 339 (Pa. Super. Ct. 2005). The tort claims barred are those:

> (1) arising solely from a contract between the parties; (2) where the duties allegedly breached were created and grounded in the contract itself; (3) where the liability stems from a contract; or (4) where the tort claim essentially duplicates a breach of contract claim or the success of which is wholly dependent on the terms of the contract.

*Id*. (citations omitted). "The gist-of-the-action doctrine is a theory under common law 'designed to maintain the conceptual distinction between breach of contract claims and tort claims.'" *Frank C. Pollara Group, LLC v. Ocean View Inv. Holding, LLC*, 784 F.3d 177, 186 (3d Cir. 2015) (quoting *eToll, Inc. v. Elias/Savion Adver., Inc.*, 811 A.2d 10, 13 (Pa. Super. Ct. 2002)).

While, "[t]o date, no Pennsylvania state appellate court has addressed the interplay between fraud and the gist of the action doctrine," the Court in *eToll* summarized such as

17

follows: "the cases seem to turn on the question of whether the fraud concerned the performance of contractual duties. If so, then the alleged fraud is generally held to be merely collateral to a contract claim for breach of those duties. If not, then the gist of the action would be fraud, rather than any contractual relationships between the parties." *eToll, Inc.*, 811 A.2d at 15-16, 19. While Courts are still grappling with the highly fact-driven analysis in applying the gist-of-the-action doctrine to claims of fraud, this District has previously determined that "[o]nce a plaintiff proved that a defendant intended not to perform under a contract, any fraud claims would precisely duplicate any contract claims." *Vives v. Rodriguez*, 849 F. Supp. 3d 507, 521 (E.D. Pa. 2012).

As an example of an alleged fraudulent or negligent misrepresentation, Plaintiffs assert that Defendants misrepresented to the Township of Edgmont whether all homes in the neighborhood would contain a deck. Resp. 14. Even assuming such fraud did not arise from the contract between Plaintiffs and Defendants, Plaintiffs fail to explain, and this Court fails to see, how they have standing[5] to bring such a claim. As stated in their Amended Complaint, all of Plaintiffs' alleged fraudulent and negligent misrepresentation claims are centered around Defendants' breach of their contractual duties. *See Werwinski v. Ford Motor Co.*, 286 F.3d 661, 678 (3d Cir. 2002) ("[T]he alleged fraudulent concealment 'did not cause harm to the plaintiffs distinct from those caused by the breach of contract; and the mere fact that disclosure of certain facts to plaintiffs may have allowed them to take corrective action does not change that result.'")

---

[5] To establish standing, "a plaintiff invoking federal jurisdiction bears the burden of establishing three elements...First, it must establish that it has suffered an 'injury in fact,' meaning a concrete and particularized invasion of a legally protected interest." *Hartig Drug Co., Inc. v. Senju Pharmaceutical Co. Ltd.*, 836 F.3d 261, 269 (3d Cir. 2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). "Second, [a plaintiff] must establish a 'causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.'" *Id.* (citing *Lujan*, 504 U.S. at 506) (internal quotation marks omitted). Third, a plaintiff must establish "a likelihood 'that the injury will be redressed by a favorable decision.'" *Id.* (citing *Lujan*, 504 U.S. at 561).

(citing *Pub. Serv. Enter. Group, Inc. v. Phila. Elec. Co.*, 722 F. Supp. 184, 201 (D.N.J. 1989)). Without further explanation or distinction, the Court agrees with Defendants that Plaintiffs' concerns can be appropriately handled by way of their breach of contract claim and are barred by the gist-of-the-action doctrine. Thus, Defendants' Motion as to Plaintiffs' claims for fraudulent misrepresentation (Count IV) and negligent misrepresentation (Count V) is granted.

## VI.    Conclusion

For the foregoing reasons, Defendants' Motion to Dismiss is granted in part and denied in part. An appropriate Order follows.