IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AIMEE WIGO et al. | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 21-3327 |
| ROCKWELL DEVELOPMENT GROUP | : | |
| LLC et al. | : | |

## MEMORANDUM

**SURRICK, J.**                                                                 **SEPTEMBER 17, 2025**

## I.    INTRODUCTION

In their Third Amended Complaint, Plaintiffs Aimee Wigo and Jessica Mazzeo assert several claims against Rockwell Development Group LLC, Rockwell Edgmont, LLC, Rockwell Edgmont II, LLC, Rockwell Homes, LLC, and Rockwell Custom, LP (collectively, "Rockwell") and Valley Forge Real Estate Group, LLC ("VFREG"). Plaintiffs assert the following claims against Rockwell: discrimination and interference under the Fair Housing Act, 42 U.S.C. § 3604, *et seq.* ("FHA") ("Count I"); violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL") ("Count II"); and breach of contract ("Count III"). Plaintiffs also assert aspects of their UTPCPL claim under Count II against VFREG, and Plaintiffs separately assert a claim of negligent misrepresentation and/or concealment solely against VFREG ("Count IV").

On September 16, 2024, Rockwell moved for summary judgment on Counts I–III, and VFREG separately moved for summary judgment on Counts II and IV. The same day Plaintiffs filed a combined motion seeking leave to file a third amended complaint and a cross motion for summary judgment in its favor on all claims. On January 15, 2025, this Court—applying the liberal standard for amendment under Federal Rule of Civil Procedure 15(a)—granted Plaintiffs' Motion for Leave to File a Third Amended Complaint to address an opinion issued by the United

States Court of Appeals for the Third Circuit in a similar case, *Catena v. NVR, Inc., t/b/d/a Heartland Homes of PA*, No. 23-1642, 2024 WL 4003085 (3d Cir. Aug. 30, 2024), which was issued just two weeks prior to the dispositive motions deadline in this case. (ECF No. 114.) On January 16, 2025, the Court docketed the Third Amended Complaint at ECF No. 116. In a joint status report filed on January 24, 2025, the Parties represented that they did not need more discovery to address allegations raised for the first time in the Third Amended Complaint. However, the Parties requested an opportunity to supplement summary judgment briefing. The Parties' motions for summary judgment have been fully briefed and are ripe for disposition.

For the following reasons, Defendants' motions for summary judgment will be granted in part and denied in part, and Plaintiffs' motion for summary judgment will be denied.[1]

## II.    FACTUAL BACKGROUND

This dispute arises out of each of the Plaintiffs' purchase of a home in a residential development called the Carriages at Runnymeade Farm ("The Carriages") when construction on the neighborhood was just beginning. Plaintiff Aimee Wigo, then Aimee Moran ("Wigo"), entered into a purchase agreement with Rockwell Edgmont, LLC for 504 Trotters Court at The Carriages on December 21, 2018. (ECF No. 92-3 ("Pl. SOF") ¶ 10; ECF No. 90 at 10–24 ("VFREG SOF") ¶ 7.) Plaintiff Jessica Mazzeo ("Mazzeo") entered into her purchase agreement for 102 Trotters Court at The Carriages on January 30, 2019. (Pl. SOF ¶ 11; VFREG SOF ¶ 8.) Together, these initial purchase agreements, each a 16-page document, are referred to herein as the "Purchase Agreements." VFREG, a real estate brokerage, was the listing broker for homes sold at The Carriages.

---

[1] The Court held oral arguments on the Parties' summary judgment motions on September 9, 2025.

Over the course of 2019, Plaintiffs remained in contact with Rockwell and, to some extent, VFREG, as well as various vendors and contractors, as their homes were constructed. (*See, e.g.*, Pl. SOF ¶¶ 23, 111–12; VFREG SOF ¶ 34.) Wigo moved into her home on November 27, 2019, and Mazzeo moved into her home on December 19, 2019. (Pl. SOF ¶¶ 25, 26.) Shortly after moving in, Plaintiffs began to identify alleged issues with their homes' construction that required alterations or repairs. These alleged issues form the basis of this litigation.

At all relevant times, Plaintiffs were unmarried and did not live with a man in the house. (Pl. SOF ¶¶ 27, 35.) Plaintiffs testified that, during the course of construction and repairs, they were subjected to numerous uninvited intimate advances—several of which occurred in their homes—including inappropriate touching and being repeatedly asked out on dates (no fewer than a dozen times) by men contracted by Rockwell. Plaintiffs also contend that while Rockwell pushed back against their maintenance and repair requests and blamed them for issues such as appliance malfunctions that were later shown to be the result of faulty construction, households that included a man were not subjected to such treatment and had issues corrected in a more timely fashion.

Although Rockwell eventually addressed many of Plaintiffs' complaints, disputes remain regarding several features of the homes, including water pressure, HVAC, and structural components. Most prominently, Plaintiffs take issue with the fact that their floors are made of "engineered hardwood" rather than the genuine hardwood they feel was advertised. In addition, Plaintiffs purchased decks from Rockwell. (Pl. SOF ¶¶ 115–16; VFREG SOF ¶ 34.) When they made their purchases, they understood the decks to be optional. After a dispute with Edgemont Township regarding whether decks would be required for all homes, Rockwell conceded to the township that all homes would be required to have a deck. (Pl. SOF ¶¶ 108–09; VFREG SOF ¶¶ 34–36.) The date that this agreement with the township took place is not clearly established in

the record.  According to Plaintiffs, at a pre-construction meeting in March 2019, representatives of Rockwell and VFREG represented to Mazzeo that she was running out of time to purchase a deck from Rockwell and that Rockwell would install a safety bar across the patio doors on her home if she did not opt for a deck.  Shortly thereafter, Mazzeo purchased her deck.  Moran followed suit several months later.  In March 2020, Mazzeo discovered during an HOA meeting that Rockwell had eventually agreed with the township that no home could be sold without a deck.  (Pl. SOF ¶ 117.)  Plaintiffs state that at least two households that had a male homeowner did not pay for their decks.  Specifically, Plaintiffs reference the DePonts (Matthew and Natalie), and William Smith.

As the homes were not yet constructed when the parties entered into their contracts, interpretation of the terms of the Purchase Agreements and other descriptive materials provided to the Plaintiffs by Rockwell and/or VFREG plays a central role in this litigation.  A brochure provided to the Plaintiffs during the sales process (the "Marketing Brochure") referred to "Luxury Custom Homes" and included a page titled "Included Features" (the "Included Features List") enumerating dozens of attributes of the to-be-constructed homes, including GE appliances, recessed lighting, granite countertops and, crucially, "Hardwood Floors Entire Main Level." (Plaintiff SOF ¶ 98; VF SOF ¶ 9.)  The Included Features List also specified "Hardwood Floors" among the home's kitchen and bathroom features.  Plaintiffs were also provided with a "Selectable Options" document listing prices for various upgrades, including the decks, which were listed under the heading "Miscellaneous Options" and included a note in the margin stating, "Pending Township Approval."  (Plaintiff SOF ¶ 17.)

The Purchase Agreements themselves contained several relevant provisions. Paragraph 14, titled "Oral Statements or Promises" and referred to herein as the "Oral Statements Clause" read in part as follows:

> This Agreement (and any contemporaneous documents entered into, referred to and/or incorporated herein by reference) contains the entire agreement between the Parties relating to the transactions contemplated by this Agreement and supersedes all previous understandings and agreements between the Parties relating to these transactions, whether express or implied, oral or written. Each Party acknowledges that, in agreeing to enter into this Agreement, it has not relied on any representation, warranty, collateral contract or other assurance (except those set out in this Agreement and any documents referred to herein) made by or on behalf of any other Party or any other person whatsoever before the execution of this Agreement.

The Oral Statements Clause also provided blank lines and instructed the purchaser of the property write out "any oral statements or promises that the Seller or Seller's representative or agent has made which are not already included in this Agreement." In addition, the Oral Statements Clause concluded with the following language (the "Fraud Carveout"):

> Each Party waives all rights and remedies which, but for this Paragraph 14, might otherwise be available to it with respect to any such representation, warranty, collateral contract or other assurance, provided that nothing in this Paragraph shall limit or exclude any liability for willful misconduct or fraud. This Agreement may only be amended by a written document duly signed by all Parties.

Paragraph 26 of the Purchase Agreements, titled "Integration Clause (Entire Agreement)" and referred to herein as the "Integration Clause," read in its entirety as follows:

> This Agreement and any riders, amendments, addenda, acknowledgements and related written instruments in connection hereto contain the entire agreement and understanding between the Seller and Purchaser relating to the transactions contemplated by this Agreement and supersedes all previous understandings and agreements between the Parties relating to these transactions, whether express or implied, oral or written. Both the Seller and Purchaser acknowledge that, in agreeing to enter into this Agreement, each Party has not relied on any representation, warranty, collateral contract, promise, term, or any other agreement made by or on behalf of any other Party or any other person whatsoever before execution of this Agreement and related documents, whether same was oral or written in nature. Any modifications or other changes to this Agreement shall be valid only if in writing and signed by an authorized representative for each Party.

5

> Under no circumstances will oral changes be allowed or valid; this condition cannot
> be waived.

Together, the Oral Statements Clause and the Integration Clause are referred to herein as the

"Integration Provisions."

Paragraph 13(a), titled "Limited New Home Warranty – General" and referred to herein as

the "Warranty Acknowledgment," read in part as follows:

> Seller has agreed to provide a limited warranty on certain improvements to the
> Property (the "Warranty").  Purchaser does hereby acknowledge that Purchaser has
> received a copy of the warranty booklet setting forth the terms and conditions of
> the Warranty and has had a chance to review said warranty booklet prior to signing
> this Agreement.  Purchaser further acknowledges that the Warranty is limited by
> and to its express terms and contains and constitutes the only warranty coverage
> from Seller that shall apply to the Property.

Finally, Paragraph 15(b), titled "Default and Damages – Purchaser's Damages" and

referred to herein as the "Purchaser's Damages Clause," read in its entirety as follows:

> In the event of a default under or breach of this Agreement by the Seller, the
> Purchaser's sole remedy shall be to elect either: (i) the recovery of the Deposit and
> other amounts paid hereunder, in which event this Agreement shall be terminated
> and thereafter the Parties shall have no further rights or obligations toward the other
> Party; or (ii) specific performance of Seller's obligations hereunder.  To the fullest
> extent permitted by law, Seller is not responsible for non-economic damages or any
> special, punitive, consequential, or incidental damages or damages for delays.
> Notwithstanding the foregoing, Purchaser's remedies against Seller shall not be
> limited if Seller breaches it obligation to reach Substantial Completion of the Home
> within twenty-four (24) months after the date on which this Agreement is signed by
> all Parties unless due to causes recognized as impossibility of performance under
> applicable law.

## III.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant

shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment

as a matter of law."  A dispute is "genuine" if there is a sufficient evidentiary basis on which a

reasonable jury could return a verdict for the non-moving party.  *Kaucher v. Cty. of Bucks*, 455

F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

"[A] factual dispute is material only if it might affect the outcome of the suit under governing law."
*Id.* The court must view the evidence in the light most favorable to the non-moving party. *Galena
v. Leone*, 638 F.3d 186, 196 (3d Cir. 2011).

Where the nonmoving party bears the burden of proof at trial, the moving party may
identify an absence of a genuine issue of material fact by showing the court that there is no
evidence in the record supporting the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S.
317, 322 (1986); *UPMC Health Sys. v. Metro. Life Ins. Co.*, 391 F.3d 497, 502 (3d Cir. 2004). If
the moving party carries this initial burden, the nonmoving party must set forth specific facts
showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(c) ("A party asserting that a
fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials
in the record . . ."); *see also Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 586
(1986) (noting that the nonmoving party "must do more than simply show that there is some
metaphysical doubt as to the material facts"). "Where the record taken as a whole could not lead
a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"
*Matsushita*, 475 U.S. at 587 (citation omitted).

## IV.     DISCUSSION

### A.     Fair Housing Act

Defendant Rockwell moves for summary judgment with respect to Plaintiffs' claims of
discrimination and harassment under the FHA, and Plaintiffs cross move for summary judgment
on the same claims. The FHA forbids discrimination "against any person in the terms, conditions,
or privileges of a sale or rental of a dwelling, or in the provision of services or facilities in
connection therewith, because of race, color, religion, sex, familial status, or national origin." 42
U.S.C. § 3604(b). It further provides that "[i]t shall be unlawful to coerce, intimidate, threaten, or

7

interfere with any person in the exercise or enjoyment of...any right granted or protected by section 803, 804, 805, or 806 of this title." 42 U.S.C. § 3617.

### 1. *FHA Discrimination.*

To state a claim for disparate treatment under the FHA, "[a] plaintiff must show that some discriminatory purpose was a motivating factor behind the challenged action." *White v. Barbe*, 767 F. App'x 332, 334 (3d Cir. 2019). The discriminatory purpose need not be malicious or invidious, nor need it figure in "solely, primarily, or even predominantly" into the motivation behind the challenged action. *See Cmty. Hous. Tr. v. Dep't of Consumer & Regul. Affs.*, 257 F. Supp. 2d 208, 225 (D.D.C. 2003); *see also Horizon House Developmental Servs., Inc. v. Twp. of Upper Southampton*, 804 F. Supp. 683, 696 (E.D. Pa. 1992), *aff'd*, 995 F.2d 217 (3d Cir. 1993) ("In order to prove intentional discrimination it is not necessary to show an evil or hostile motive. It is a violation of the FHA[] to discriminate even if the motive was benign or paternalistic."). The plaintiff is only required to "show that a protected characteristic played a role in the defendant's decision to treat her differently." *Cmty. Hous. Trust*, 257 F.Supp.2d at 225.

At summary judgment, Plaintiffs can raise an inference of discrimination in a number of ways, including with "comparator evidence . . . or direct evidence of discrimination[.]" *Golod v. Bank of Am. Corp.*, 403 F. App'x 699, 702 n.2 (3d Cir. 2010) (considering a Title VII employment discrimination claim); *see also Curto v. A Country Place Condo. Ass'n*, 921 F.3d 405, 411 n.4 (3d Cir. 2019) ("we frequently rely on our Title VII jurisprudence to guide our understanding of the FHA's antidiscrimination provisions"). Here, Plaintiffs primarily rely on comparator evidence to show "they were treated differently from similarly situated persons or groups because of race, color, religion, sex, familial status, or national origin." *30 Clinton Place Owners Inc. v. City of New Rochelle*, No. 13-3793, 2014 WL 890482, at *12 (S.D.N.Y. Feb. 27, 2014).

Plaintiffs argue that they suffered discrimination in two primary respects because of their status as unmarried women: (1) Rockwell ignored their concerns regarding issues with their houses and attempted to shift the blame back to Plaintiffs for defects in their homes and (2) Rockwell misled Plaintiffs with respect to costs and options with respect to deck installations.

First we address Plaintiffs' more generalized concerns. Plaintiffs contend that Rockwell disregarded their complaints and sought to blame them for problems they encountered in their homes, but there is little in the record to support an inference that these issues were related to Plaintiffs' gender and/or marital status. As an initial matter, Plaintiffs attempt to support this argument by referring to several generalized complaints regarding defects in their home without any linkage to their status as unmarried women. (*See, e.g.*, Pl. SOF ¶¶ 64, 66–67, 71.) Elsewhere, Plaintiffs argue that Rockwell attempted to shift fault back to Plaintiffs by designating their concerns as Plaintiffs' own fault or "operator error," essentially arguing that they received inferior services due to improper stereotyping and misconceptions. (*See id.* at ¶¶ 43–44.) For support, Plaintiffs refer to a letter in which Project Manager Nichole Sargent stated that Plaintiffs Wigo and Mazzeo had beautiful homes despite how "hard [it is] to keep up with family and dog[s]." (*Id.* at ¶ 58.) Plaintiffs also make broad references to other homebuyers receiving more favorable treatment.[2] However, even viewed in the light most favorable to Plaintiffs, we find that such evidence is too speculative. Plaintiffs have not adduced sufficient evidence to permit a reasonable

---

[2] In its Opposition (ECF No. 96 at 23), Plaintiffs argue in response that "homes where a male was present received far superior customer service and responsiveness in dealing with home defects" and cite to an affidavit by William Smith. But in that affidavit, Smith states that, although he received certain upgrades at no additional cost, that he has also had "significant issues with [the] HVAC system, water penetration and roofing and siding problems" and "garage door defects which were never corrected resulting in the garage door collapsing." (*See* Pl. Appx. at 172–73.) Smith also states that the "hardwood flooring in my home has chips, scratches and other significant wear and tear." (*Id.*) In short, to the extent that Plaintiffs seek to rely on affidavits to show that they received inferior service to men and married couples, the affidavits instead show that people of all different statuses—men, married couples, and single women alike—received substandard service.

factfinder to conclude that the treatment they received from Rockwell in response to their concerns were due to their protected status.

Second, Plaintiffs argue that they were misled about the need to pay for decks because they were unmarried women. As comparator evidence, Plaintiffs refer to the affidavits of Matthew DePont and William Smith, in which both affiants claim that they received their decks free of charge. However, inspection of the record reveals that neither individual was an appropriate comparator because they were not "similarly situated" in all material aspects. *See Qin v. Vertex, Inc.*, 100 F.4th 458, 474 (3d Cir. 2024) (finding in the Title VII context that comparators "need not be identical but must be similarly situated in 'all material respects.'"). Although Matthew DePont and his wife signed a purchase agreement for their home around the same time as Plaintiffs (i.e., "in or about December 2018"), Natalie DePont stated in a text message that she and her husband did not pay for the deck because they were "fighting with [Rockwell] on something and [Rockwell] 'threw in the deck' to make up for whatever we were fighting them on." (ECF No. 92-9 at 59.) Further, Plaintiff Mazzeo testified that the DePonts encountered significant delays that prevented them from moving in for more than two months, and that Matthew DePont and his wife received a free deck as a courtesy due to these delays.[3] In addition, William Smith, the other referenced comparator, did not enter his purchase agreement until on or about February 21, 2020, at which point Rockwell was aware that Edgemont Township would not relent regarding the requirement that all of the homes have decks and had "adjusted the base price on every home that had not already been under contract." (*See* Pl. SOF, ¶ 109.)[4] As neither William Smith nor the DePonts

---

[3] *See* Mazzeo Dep., ECF No. 97-9, at 100:6–14.

[4] Plaintiffs concede that "for Rockwell to be profitable, Rockwell had to pressure some homebuyers to sign change orders and pay an extra charge for the decks" and refer to a spreadsheet, which appears to show that only two homes received a deck free of charge, and that all other homes were either required to pay for the

were similarly situated in "all material aspects," Plaintiffs have not provided sufficient evidence to survive summary judgment on this issue. *See Hampshire v. Bard*, 793 F. App'x 75, 80 (3d Cir. 2019) (affirming summary judgment where plaintiffs were not similarly situated and explaining that "[w]hile it is true that the sufficiency of evidence is typically an issue of fact for the jury, a court may nonetheless grant summary judgment if no reasonable jury could find that the individuals identified by the plaintiffs were similarly situated.").

Accordingly, summary judgment is granted in favor of Rockwell on the discrimination portion of Plaintiffs' FHA claim.

## 2.    *FHA Interference.*

"The FHA also prohibits coercion, intimidation, threats against or interference with any person in the exercise or enjoyment of rights granted or protected by the FHA." *Davis v. Rubin*, No. 20-cv-6271, 2020 WL 7624833, at *3 (E.D. Pa. Dec. 22, 2020) (citing 42 U.S.C. § 3617). "A Section 3617 interference claim requires proof of three elements: (1) that the plaintiff exercised or enjoyed any right granted or protected by [the FHA]; (2) that the defendant's conduct constituted interference; and (3) a causal connection existed between the exercise or enjoyment of the right and the defendant's conduct." *Revock v. Cowpet Bay W. Condo. Ass'n*, 853 F.3d 98, 112–13 (3d Cir. 2017) (citations omitted). "Interference under Section 3617 may consist of harassment, provided that it is 'sufficiently severe or pervasive' as to create a hostile environment." *Id.* at 113. Further "[h]arassment that intrudes upon the 'well-being, tranquility, and privacy of the home' is considered particularly invasive." *Id.* Sexual harassment is actionable under the FHA when it creates a hostile housing environment or constitutes *quid pro quo* sexual harassment. *See Quigley v. Winter*, 598 F.3d 938, 946–47 (8th Cir. 2010).

---

deck as a separate expense, or it was included in the pricing of the house. (*See* ECF No. 92-6 at APP000312.) Plaintiffs also admit that one of the free decks was provided to a single woman.

Here, Plaintiffs' theory can be characterized as a "hostile housing environment" claim, which occurs when a victim is subjected to "to unwelcome sexual harassment, and the harassment was sufficiently severe or pervasive so as to interfere with or deprive [the victim] of her right to use or enjoy her home." *United States v. Hurt*, 676 F.3d 649, 654 (8th Cir. 2012).

Rockwell and Plaintiffs primarily dispute whether the harassing conduct of which Plaintiffs complained is sufficiently "severe or pervasive" to constitute cognizable harassment under the FHA. Viewed in the light most favorable to Plaintiffs, the record indicates that Plaintiffs were subjected to numerous uninvited intimate advances—several of which occurred in their homes—including inappropriate touching and being repeatedly asked out on dates (no fewer than a dozen times). (*See* Pl. SOF at ¶¶ 47–57.) We find that Plaintiffs have presented evidence from which a reasonable factfinder could determine that they were subjected to severe or pervasive harassment. *See Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 168 (3d Cir. 2013) (explaining that, in assessing whether conduct is sufficiently severe or pervasive, courts should consider the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it causes unreasonable interference). Moreover, this assessment will require weighing the evidence and assessing credibility, so summary judgment is inappropriate. Rockwell's and Plaintiffs' summary judgment motions are therefore denied with respect to the FHA interference claim.

**B.    Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL").**

Plaintiffs assert that Rockwell violated the UTPCPL by failing to comply with the terms of any written guarantee or warranty, 73 Pa. Stat. § 201-2(4)(xiv) ("Warranty Provision"), and making repairs, improvements, or replacements on tangible, real or personal property of a nature or quality inferior to or below the standard of that agreed to in writing, *id.* § 201-2(4)(xvi) ("Repair

Provision").  Plaintiffs also assert claims against both Rockwell and VFREG for engaging in fraudulent or deceptive conduct by making various representations regarding the nature and quality of the home and its features, which created a likelihood of confusion or of misunderstanding, *id.* § 201-2(4)(xxi) (the "Catch-All Provision").   The Parties cross move for summary judgment on these claims.

As an initial matter, we find that resolving Plaintiffs' claims regarding the Warranty Provision and Repair Provision of the UTPCPL against Rockwell requires weighing evidence and assessing credibility, such that these claims cannot be resolved on summary judgment.  Moreover, in *Catena* the Third Circuit clearly stated that such actions are not barred under the gist of the action doctrine based on the plain language of these provisions.  *See* 2024 WL 4003085 at *7–8.

Both Rockwell and VFREG argue that summary judgment is warranted on Plaintiffs' deceptive practices claim under the Catch-All Provision of the UTPCPL.  To establish a claim under the UTPCPL, a party must demonstrate that: (1) they purchased or leased goods or services primarily for a personal, family, or household purpose; (2) they suffered an ascertainable loss of money or property; (3) the loss occurred due to the use or employment by a vendor of a method, act, or practice declared unlawful by the UTPCPL; and (4) the consumer justifiably relied upon the unfair or deceptive business practice when making the purchasing decision.  *See Gregg v. Ameriprise Fin., Inc.*, 664 Pa. 567, 582 (2021) (citations omitted).  With respect to the third element, under the Catch-All Provision an "unfair or deceptive practice" is defined as "any . . . fraudulent or deceptive conduct which creates a likelihood of confusion or misrepresentation."  73 Pa. Stat. § 201-2(4)(xxi).  Such conduct covers both oral and written representations.  *Catena*, 2024 WL 4003085 at *7.

13

At the outset, Defendants argue that Plaintiffs' deceptive practices claim is barred to the extent it is based on pre-contractual statements under *Catena v. NVR, Inc.*, No. 23-1642, 2024 WL 4003085 (3d Cir. Aug. 30, 2024).  There, the Third Circuit concluded that "any reliance by [p]laintiffs upon extra-contractual representations was unjustified given the express language of the integration clause."  *Id.* at 4.  Like in *Catena*, the Oral Statements Clause in the contract at issue here contains express non-reliance language that the Parties have "not relied on any representation, warranty, collateral contract or other assurance … made by or on behalf of any other Party or any other person whatsoever before the execution of this Agreement."  (Pl. Resp., ECF No. 96, 18 ¶ 15.)  Given this express language, Plaintiffs' deceptive practices claim fails to the extent that they seek to premise their claims on pre-contractual statements or representations, since any reliance on those statements would not have been justifiable.  *See Catena*, 2024 WL 4003085 at *5 ("[p]laintiffs could not justifiably rely upon the luxury statements or other extra-contractual promises as such statements were superseded by the contract"); *see also Yocca v. Pittsburgh Steelers Sports, Inc.*,6 854 A.2d 425, 439 (Pa. 2004) (finding that plaintiffs "cannot be said to have justifiably relied on any representations made [in an advertising brochure] . . . before the parties entered" into the contract and that the UTPCPL Catch-All Provision claim thus failed).

Further, although Plaintiffs refer to *SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183 (3d Cir. 2022) for support, that case instead reinforces our conclusion.  In *Sodexo*, the Third Circuit devoted significant attention to the conspicuous absence of "fraud-insulating" provisions and "no-reliance" language.  *Id.* at 212–16.  But such language is present here.  *Compare* 24 F.4th 183 at 214 ("through the operation of the parol evidence rule, a no-reliance clause in an integrated contract precludes fraudulent inducement claims that depend on a precontractual misrepresentation") *with* (ECF No. 96, 18 ¶ 15, "Oral Statements Clause").

Next, we turn to Plaintiffs' theory that Defendants' misrepresentations were incorporated into the Purchase Agreements. We reserve for trial the issue of whether promotional and marketing materials such as the Marketing Brochure and its Included Features List were incorporated. *See infra* at Part IV, Section C. However, even assuming that marketing and promotional materials containing the purported misrepresentations were incorporated into the contract, Plaintiffs' deceptive practices claim would still be barred based on the gist of the action doctrine.

The gist of the action doctrine provides that "an alleged tort claim against a party to a contract, based on the party's actions undertaken in the course of carrying out a contractual agreement, is barred when the gist or gravamen of the cause of action stated in the complaint, although sounding in tort, is, in actuality, a claim against the party for breach of its contractual obligations. *Earl v. NVR Inc.*, 990 F.3d 310, 315 (3d Cir. 2021). Further, "[w]hether the gist of the action doctrine applies in any particular setting is a question of law." *PPG Industries, Inc. v. Generon IGS, Inc.*, 760 F.Supp.2d 520, 528 (W.D. Pa. 2011) (citations omitted).

In *Bruno v. Erie Ins. Co.*, 106 A.3d 48, 68 (Pa. 2014), the Pennsylvania Supreme Court elaborated on how courts could distinguish contractual claims (involving "nonfeasance") from tort claims (involving "misfeasance") when applying the gist of the action doctrine:

> If the facts of a particular claim establish that the duty breached is one created by the parties by the terms of their contract—*i.e.*, a specific promise to do something that a party would not ordinarily have been obligated to do but for the existence of the contract—then the claim is to be viewed as one for breach of contract. If, however, the facts establish that the claim involves the defendant's violation of a broader social duty owed to all individuals, which is imposed by the law of torts and, hence, exists regardless of the contract, then it must be regarded as a tort.

Here, to the extent that any misrepresentations were incorporated into the contract, the failure to comply with those terms is primarily a breach of specific contractual duties—not a breach of a broader social obligation (i.e., nonfeasance rather than misfeasance). Still, under *Catena*

nonfeasance may be actionable when the UTPCPL's statutory language evidences a clear intent of the legislature to permit such claims. *See* 2024 WL 4003085 at *8 ("We begin and end with the text.")  There, the Third Circuit found that claims based on nonfeasance could proceed under warranty and repair provisions of the UTPCPL, since the unambiguous language of those provisions clearly embraced claims based on the "mere failure to perform [a contract] (nonfeasance)." *Id.*  However, *Catena* also specifically distinguished other cases that had found nonfeasance non-actionable under the Catch-All Provision of the UTPCPL.  *See id.* at *7 (distinguishing *Horowitz v. Fed. Kemper Life Assur. Co.*, 57 F.3d 300, 307 (3d Cir. 1995) and *Gordon v. Pa. Blue Shield*, 548 A.2d 600, 604 (Pa. Super. Ct. 1988)).  We therefore find that, to the extent Plaintiffs argue that the Defendants' misrepresentations were incorporated into the contract, such claims cannot proceed under the Catch-All Provision of the UTPCPL.

Finally, to the extent Plaintiffs' UTPCPL claim under the Catch-All provision is based on post-contractual representations regarding whether decks were optional or required by Edgmont Township, genuine disputes of material fact preclude summary judgment.  In particular, the record does not clearly establish when Rockwell learned, or should have known, that the township would not relent in its insistence that decks would be required on Plaintiffs' homes.  Without a clear record on timing, we are unable to resolve as a matter of law whether or not Defendants' representations were in fact deceptive.  Further, although Rockwell argues in the alternative that summary judgment is warranted because Plaintiffs have not shown any ascertainable loss, we find that resolving this issue also necessitates further development of the record.[5]  For these reasons,

---

[5] VFREG separately argues that there is no evidence that, when Plaintiffs purchased their decks, VFREG "knew or had been told about any issue with Edgmont Township regarding whether installation of decks was required."  (ECF No. 90 at 5.)  Since the record is unclear regarding when VFREG knew, or should have learned, of this requirement, this issue will entail weighing evidence and assessing credibility at trial.

Plaintiffs' UTPCPL Catch-All Provision claim may proceed only with respect to post-contractual representations regarding Plaintiffs' decks and whether they were optional or required.

### C.    **Breach of Contract**

In Count III, Plaintiffs bring a breach of contract claim against Rockwell under Pennsylvania law.  Plaintiffs allege that Rockwell violated the parties' contracts by constructing homes that failed to meet many of the specifications laid out in the Plaintiffs' Purchase Agreements and related documents and by failing to fulfill its warranty and repair obligations.  The alleged violations include issues related to the homes' "hardwood" floors, HVAC systems, water pressure, and structural elements, as well as protracted delays in addressing these and other issues.

"It is well-established that three elements are necessary to plead a cause of action for breach of contract: (1) the existence of a contract, including its essential terms, (2) a breach of the contract; and, (3) resultant damages."  *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. L. Firm of Malone Middleman, P.C.*, 137 A.3d 1247, 1258 (Pa. 2016).

Rockwell has moved for summary judgment on Count III, arguing that Plaintiffs cannot show breach of contract as a matter of law because alleged waivers in the Warranty Acknowledgement and the Purchaser's Damages Clause (together, the "Damages Provisions") of the Purchase Agreements bar Plaintiffs from establishing damages.

Plaintiffs have likewise moved for summary judgment on breach of contract, arguing that the undisputed facts establish the existence of the home-purchase contracts and Rockwell's deviation from the contractual terms.  Plaintiffs further argue that any waivers in the Damages Provisions were limited by separate language in the Oral Statements Clause that preserved Plaintiffs' rights and remedies with respect to willful misconduct or fraud.

We decline to grant summary judgment on Count III in favor of either party.  Although the existence of contracts between the parties is undisputed, Rockwell noted in briefing after the

Plaintiffs' submission of the Third Amended Complaint that "[t]he extent of the 'integration' of the Purchase Agreements is disputed and subject to proof at trial as there is no evidence in the record of what comprises the Purchase Agreements." (ECF No. 126, ¶¶ 16–20.) Accordingly, the bounds and therefore terms of the parties' contracts remain in dispute.

On the issue of damages, we note that Plaintiffs' argument regarding the Fraud Carveout in the Oral Statements Clause clearly falls short as a response to Rockwell's damages-waiver argument, as the explicit purpose of the language quoted by Plaintiffs is to limit any waivers that would be effected by the Oral Statements Clause itself, with no effect as to potential waivers elsewhere in the Purchase Agreements. However, we also find Rockwell's argument as to the Damages Provisions unavailing at this stage, as the briefing incorrectly frames compensatory damages as either consequential or incidental, ignoring the potential for direct or general damages and other remedies. *See, e.g.*, *The Birth Ctr. v. The St. Paul Cos., Inc.*, 787 A.2d 376, 394 n.1 (Pa. 2001) (noting that "general damages compensate the injured party for the immediate injury or loss sustained" and separately "consequential damages are damages that flow from the consequences of the direct injury"); *Jay Jala, LLC v. DDG Constr., Inc.*, No. 15-3948, 2016 WL 6442074, at *2 (E.D. Pa. Nov. 1, 2016) ("Direct damages refer to those which the party lost from the contract itself—in other words, the benefit of the bargain—while consequential damages refer to economic harm beyond the immediate scope of the contract.") (quoting *Atl. City Associates, LLC v. Carter & Burgess Consultants, Inc.*, 453 F. App'x. 174, 179 (3d Cir. 2011)).

Accordingly, the damages-waiver argument requires further development. In addition, genuine issues of material fact exist regarding which, if any, supplementary documents were incorporated into the Purchase Agreements, and whether Rockwell's performance amounted to breach of any of the contract terms. Summary judgment on this claim is thus denied.

### D.    <u>Negligent Misrepresentation and/or Concealment</u>

In Count IV, Plaintiffs bring a claim for negligent misrepresentation and/or concealment against VFREG.  Plaintiffs allege that VFREG (1) inaccurately represented to Plaintiffs that the homes they were considering purchasing would feature "hardwood floors" and would otherwise be of "luxury" quality and (2) concealed from Plaintiffs that the "optional" decks they purchased from Rockwell were actually required to be installed by the township.

Under Pennsylvania law, a negligent misrepresentation claim requires proving: "(1) a misrepresentation of a material fact; (2) made under circumstances in which the misrepresenter ought to have known its falsity; (3) with an intent to induce another to act on it; and (4) which results in injury to a party acting in justifiable reliance on the misrepresentation." *Bortz v. Noon*, 729 A.2d 555, 561 (Pa. 1999).

Defendant VFREG argues that summary judgment should be granted in its favor on Count IV in the first instance because any claims premised on the Plaintiffs' reliance on alleged pre-contractual representations are barred by the Purchase Agreements' Integration Provisions.  In addition, VFREG also contends that any representations regarding the "luxury" quality of the homes are non-actionable puffery, that it did not make any misrepresentations regarding the hardwood floors or the decks, and that the Plaintiffs did not incur any damages with respect to the decks because they always intended to purchase decks.

Plaintiffs argue that VFREG's representations regarding hardwood floors during the sales process are not barred by the Integration Provisions in the Plaintiffs' Purchase Agreements because such representations were, in fact, integrated into the parties' contracts under the plain language of the Integration Provisions, and therefore reliance on such statements was not only justifiable but intended.  Plaintiffs also argue that VFREG's statements regarding the "luxury" quality of the homes were not puffery because they were contextualized by the particularized Included Features

19

List, rendering the representations sufficiently specific to be actionable. Plaintiffs have filed a cross motion for summary judgment on Count IV.

We find that VFREG's motion for summary judgement on Count IV should be granted in part and denied in part. To the extent that Count IV is based upon VFREG's representations regarding "hardwood floors," the homes' "luxury" qualities, and any other pre-contractual statements, summary judgment is granted in favor of VFREG, as the Plaintiffs' reliance on such representations was precluded by the purchase agreements' Oral Statements Clause. However, to the extent Count IV is based on alleged post-contractual statements by VFREG bearing on the Plaintiffs' purchase of decks, VFREG's motion for summary judgment is denied, as reliance on such statements was not barred by the Oral Statements Clause, and genuine issues of material fact remain regarding VFREG's knowledge or obligation to be knowledgeable of the alleged misrepresentations, the materiality of any misrepresented or concealed facts, and damages incurred by Plaintiffs. Plaintiffs' motion for summary judgment on Count IV is denied in its entirety.

To the extent that Count IV is based upon VFREG's representations regarding "hardwood floors," the homes' "luxury" qualities, and any other pre-contractual statements, Plaintiffs' claim necessarily fails for lack of justifiable reliance on such statements, as reliance was precluded by the purchase agreements' Oral Statements Clause, which included explicit non-reliance language. *See Catena*, 2024 WL 4003085, at *4–5; *see also Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425, 439 (Pa. 2004) (holding that a party "cannot be said to have *justifiably* relied on any representations" made prior to signing a contract with an integration clause, because by signing the contract they had "explicitly disclaimed reliance on any such representations"). Plaintiffs' argument that such statements were integrated into the parties' contracts via the Integration Provisions is unavailing to save their misrepresentation claim. Insofar as any representations

regarding features of the homes were incorporated into the parties' Purchase Agreements, a misrepresentation claim sounding in tort based on allegations that the homes did not reflect the contracted-for features is barred by the gist of the action doctrine. *See Williamsburg Commons Condo. Ass'n v. State Farm Fire & Cas. Co.*, 907 F. Supp. 2d 673, 679 (E.D. Pa. 2012) ("Because the alleged misrepresentations are contained in the provisions of the contract, [the plaintiff] cannot avoid the fact that the essence of their lawsuit concerns a breach of contract.").

To the extent Count IV is based on post-contractual statements by VFREG allegedly bearing on the Plaintiffs' purchase of decks, summary judgment is denied as to both parties. The parties vigorously dispute whether, at the time of Mazzeo's pre-construction meeting, VFREG knew or should have known that decks would be required for all properties or that Rockwell would not have installed safety bars on Plaintiffs' homes if they did not elect to purchase decks because that measure would not have satisfied the township requirements. Disputes also remain regarding damages. As discussed above, *see infra* at Part IV, Section B, the record does not clearly establish when Rockwell agreed with the township that it would include decks on all properties, a detail we find relevant to our analysis. As this and potentially other genuine issues of material fact remain, Plaintiffs' misrepresentation and/or concealment claim with respect to VFREG's post-contractual statements regarding decks may proceed to trial.

## V.    <u>CONCLUSION</u>

For the reasons discussed above, Defendants' motions for summary judgment will be granted in part and denied in part, and Plaintiffs' motion for summary judgment will be denied. An appropriate order follows.

BY THE COURT:

*/s/ R. Barclay Surrick*
**R. BARCLAY SURRICK, J.**
